There are three reasons to reverse his conviction. First, starting with the party's agreed upon jury instruction as to what was the statement at issue, Mr. Lee did not make a false statement because he gave a factually true answer to an ambiguous question. The jury was instructed that the agents had a right to make a false statement, but they did not make a false statement because they did not have a right to make a false statement. But instead he asked quote whether he gave his wife any money to fund her business, unquote. MR. Lee answered no. The verb gave can be limited to a gift. Mr. Lee loaned money to his wife. For all of us who have been given student loans and have been given mortgages, we know the very real difference between a gift and a loan. Mr. Lee's answer of no as to whether he gave money was factually true because he had lent it. When there is an ambiguous question and the defendant gives an answer that is factually true, that cannot support a false statement conviction. The district court dismissed this argument focusing on the noun of funding and finding that a funding can include bank loans. The judge overlooked that the verb gave is ambiguous and can include gifts and can exclude loans. Second, Mr. Lee does not have the mens rea to make a false statement. The district court properly used the 2016 revised jury instructions and told the jury that a person must know that their conduct was unlawful. In briefing the parties disputed whether speech alone meets that standard, but even accepting the government's interpretation, Mr. Lee does not meet it. He gave a factually true statement to an ambiguous question. That defeats the willful mens rea that he is lying to the government. Third, if the court disagrees and holds that the statement is a lie, it still isn't material. Materiality is admittedly a low bar. If a lie or omission causes the government to take a right when it could have taken a left, that lie usually is material. But even under that low standard, Mr. Lee's statement doesn't meet it. The key question is what would the government have done with that information in 2009 that it did not do? According to Agent Puentes, if he had that information, he could have asked for more financial information and the investigation, quote, could proceed in a different way, unquote. There is no showing that the loan was material to the state. Oh, excuse me. In this case, there was a jury trial. Correct. Right. And so I think the heart of your argument with regard to the 1001 conviction is, well, there's some ambiguity in there, the word fund versus gave. What do we do with the fact that this was litigated before a jury and two agents testified that they asked every which way whether he gave the money, whether he funded the money. They were coming at it from all different angles, and the jury accepted the credibility of the agent's testimony. What do we do with the post-trial record at this point where review is highly deferential? Yes, Your Honor, and the briefing argued the insufficiency of the evidence, but as you point out, in the jury instruction, which said SCR 22, the final statement is actually a finding where the jury was instructed as to what the statement is. Even taking that at its face value, that is an ambiguous question, and he gave a factually true answer when he said no to whether he had given money because he had loaned her the money. So when you give somebody a loan, it's not the same as giving money? That's your argument? Well, Your Honor, that it's subjected to two different interpretations. When you give a loan, that could be factually true, but also if you're asked whether you gave someone money when you had lent them money, a factually true interpretation is to say no, I had lent them the money, I did not give them the money. And again, the district court focused on funding in rejecting this argument, but by directing the court's attention to gave, it is possible that this is a factually true answer than to an ambiguous question that's subject to multiple interpretations. So going to the issue of materiality, you admit that there's a relatively low bar in terms of showing that, and I think you would also agree that the standard under Section 101 is a lower bar than that under Section 1425, which prohibits procurement of citizenship or nationalization unlawfully. Would you agree? With the first part, yes. With the second part, the jury instructions do say that it's the same standard, that there's a common law standard between the two. So you think the Maslin-Jack case is directly applicable and that the standard that's applied there to 1425 is the same as to 1001, despite the fact that cases describe the standards differently? Yes, Your Honor. And under that standard, here Agent Fuentes, when asked what he would do, he said he'd simply, quote, proceed in a different way. In that respect, it's similar to Massaui, where the Federal agent said that if they had known about a lie about military service, they would have undertaken, quote, further review. The Court said that a vague statement that the government would have done something doesn't meet the low materiality bar, because it doesn't show, quote, what decision the agency was trying to make. Well, they said what they might have done in this case, but don't the cases interpreting materiality and materiality in a different way? I mean, in regard to 1001, say things like, you don't have to, they don't have to know that it's false. They can even know, I mean, they can know that it's false, and still it could be material when the statement is made. That they don't have to change direction, that they don't have to rely upon the statement. I mean, there are all those kinds of phrases that are used in the context of 1001, which seem to be a lot less of a standard than when you're dealing with 1425, which specifically relates to prohibiting procurement of citizenship, and the tie that has to be made there. The nexus seems to be much stronger. Yes, Your Honor. Then I can direct you to Misali again. The Federal agent saying that they simply would have done further review wasn't enough, and that's akin to the facts here, where they simply sort of said they would have gone in a different way. That's different from Silva, where a guard's omission about his breach of a policy could have led to his firing, and it's different from King, where two border patrol officers would not have granted entry to a firearms dealer if they'd known about his intended conduct. But, Your Honor, even if you disagree with me on materiality, this can be resolved at the first issue that it was a factually true statement to an ambiguous question, which then moots out both the mens rea and moots out the materiality of the question. If there are no further questions, may I? I need to reserve your time. Thank you. Good morning. May it please the Court. AUSA, Brian Fairstein on behalf of the United States. Counsel, something that troubles me about this case, because it's unusual, is that there's no record of what the specific actual question was that was asked that's the basis for the false statement conviction. Usually there's 302 notes or something that fixes what the question was, if you're pursuing a false statement conviction. Yes, Your Honor, and I would just first note that the agents were taking contemporaneous notes during the interview, but there is a specific question and answer, and that was submitted to the jury in the jury instructions. Which one was it? The specific question and answer, and this was at SER 22, and this was, I'm quoting from the jury instruction. The defendant answered no to the question whether he gave his wife any money to fund her business. That question and answer. So that's the question that we're looking at. We're not looking at all the, because there's testimony about all these different other questions. There's only one question that went to the jury. That's correct, Your Honor. And that was, did you give your wife any money to fund her business? And that question and answer was not pulled out of thin air. This was agreed upon by the parties and the court in consideration of all the evidence that came in at trial, and it actually was based verbatim on testimony from the lead investigator that had interviewed the defendant. And I can direct Your Honors to multiple occasions where the lead investigator, Agent Fuentes, testified that he asked that specific question, and the defendant denied it. And that's at supplemental excerpts of record, page 92, and I'm just going to give a few examples. So the specific question that went to the jury was give wife any money to fund. So there's two words there, give and fund, that we would have to find ambiguous. And are you arguing they're unambiguous and unambiguously cover alone? Yes, Your Honor. And Ms. Hong referenced Judge Ilston's consideration of this and said that Judge Ilston did not consider what gave meant. But in fact, Judge Ilston, in her opinion, specifically stated, in fact, that she would have to give money to fund a rational trier of fact, could have found the element of falsity by concluding that whether Mr. Lee gave, and that's in italics in her decision, money to his wife for her business included giving her money he borrowed from a bank. And that's at excerpts of record, pages 15 to 16. I guess that preliminarily, did the parties jointly agree to this jury instruction? Yes, Your Honor. And that was after the defense had initially sought to have a specific unanimity instruction with various formulations of what the question and answer may have been based on the testimony of trial. And because of, as the testimony came in, as the evidence came in, the parties agreed that that was the specific question  that Ms. Hong was asking. And I'm not sure how Mr. Lee got the money, if he gave her money to fund the business. It doesn't matter what his source was. That's correct. And I would note that defense counsel argued the very point that Ms. Hong was just arguing about the ambiguity of what fund means in the context of that sentence. And that's at supplemental excerpts of record, page 617 to 620. That's closing argument from the defense. And that's what the jury made, and the jury considered it, and the jury rejected it. And all inferences at this stage go to the government. And the standard is whether any rational trier of fact could have found that the defendant, when he denied having given money to fund her business. So let's talk about materiality. Because I actually am having a hard time understanding how whatever Mr. Lee answered was capable of influencing the course of investigation. Into all these other matters that the government was investigating. Yes, Your Honor. The defendant was a federal immigration services officer. He was being investigated by the Department of Homeland Security, Office of Inspector General, effectively Internal Affairs Division, testimony trial, for his potential involvement in his wife's operation of a business engaging in prostitution. The defendant's denial of having any financial involvement or having given her money for that illegal business was significantly material to their investigation. This was not only a criminal investigation, there were criminal elements, whether there was human trafficking going on at this business, and whether there were immigration fraud going on there, but it was also an administrative one. Office of Inspector General is investigating its employees to make sure they are above reproach, that there are no conflicts of interest with respect to their involvement in illegal businesses, that they're not corruptible, and this was all testimony from Agent Fuentes and Agent Scott at trial. And so his denial of having any financial involvement, it was material to them because then they, in fact, and again, with respect to materiality, it's propensity to influence, it's not actual influence, but in fact, they went down the road of trying to determine what was his financial involvement. Because they didn't believe him. During the interview, he first denied all involvement and knowledge whatsoever of the business, and then as the agent who at that point done, this was in 2009, had done some investigation but had very limited information, they were able to confront him with that information, and he started to backtrack. So they knew that he was lying about his full involvement in this business, and they asked the defense's officer, are you involved, are you financially involved in a legal business engaging in prostitution? So they then went on an extensive financial investigation that could have been narrowed, and there's testimony about that, and when they learned, finally, in 2013, that from the defendant's wife, not from the defendant himself, that he had, in fact, obtained a loan to give her money to start her business, they called the defendant back the very next day. They urgently wanted to speak with him, because this was something that was very important to their investigation, their activities and decisions that they were making, and they wanted to speak with him immediately. The defendant did not even note that fact in the opening brief and gave it short shrift in the reply brief, but that was a very significant fact for the jury to consider, and it goes not only to falsity and his knowledge of falsity, but the materiality of this particular investigation. And you've addressed materiality, let me ask you, though, about the standard, just so we're clear. Do you think Messlingjack interpreting 1425 is dispositive in regard to what materiality is or means? Your Honor, I don't believe it's dispositive. As Your Honor notes, it is a different statute. It is procuring naturalization through an unlawful act, and it is not 1001 false statement. And so the standards, they borrow from Congress versus the United States, but the standard set forth for materiality under the Ninth Circuit's model instructions is slightly different than how, as it is interpreted in that case. However, the standard that is applied in Messlingjack, even under that standard, the defendant's denial, his false statement was material. And in that case, the court stated, and this is at Penn Site 1928, a false statement made to government officials can affect a naturalization decision in a single significant way, by distorting the government's understanding of the facts when it investigates and then adjudicates an application. And then later on, same page, as we explained in that context, a person who lies throws investigators off a trail leading to disqualifying facts, gets hurt citizenship by means of those lies. Those are the standards that are discussed in Messlingjack, which is a very specific context, different statute. But even under those standards, the defendant's denial of any financial involvement in this business distorted the investigator's understanding at a very early stage in the investigation. It threw them off the trail, and when they finally learned about his actual financial involvement, not from him, but from his wife, they urgently called him back the very next day. And if the court has no further questions on the topics I've discussed or topics raised by the defendant, the government would spin on its briefs. Right. Well, thank you, Counsel. Thank you. I have two points. First, the jury was focused on, and the judge was focused on the meaning of fund. And there's no question that a bank loan includes, funding includes a bank loan. The ambiguity comes from the verb gave. When I loan my child money, I do not tell him that I gave him money. It was not a gift. It's a loan that I expect to be repaid. Mr. Lee gave that factually true answer then to the agents when he was asked the same. Second, on materiality, I would like to direct your attention to the reply at page 11 and 12, where it cites the legal authorities showing that the legal standard in Maslin-Jeck is the same under 1001. So starting from that issue, the topics that the agents identified they were investigating were human trafficking, whether immigration fraud was being procured, whether Mr. Lee knew about crimes, and whether he was financially benefiting from any crimes. Under Maslin-Jeck, the agent has to show that a lie is relevant to an actual or potential investigation, and that there must have been a born in actual or potential disqualifying fact. This standard does not meet that standard. A preexisting loan to a spouse does not show and go to the human trafficking and abuse of power and authority that was being investigated. You mean even though that may be one step into getting to the information that because it's not directly related, that it's not material? Well, Your Honor, the question is what did the government explain? And here the government said we'd only look at further investigation. They never said this could have been relevant, this would have been relevant to an actual or potential investigation. They just said, quote, we could proceed in a different way. Well, then they mention something about bribery and so forth, they're looking at it, and that they were trying to see whether or not to follow the money or to see whether or not there's a financial connection first. Correct, Your Honor. I would submit that it's not material. If you disagree with me, I'd like to refer you back to the factually true statement to an ambiguous question. All right. All right. Thank you very much, counsel. U.S. v. Lee is submitted, and we will take it. Free stream aircraft v. Arrow Logger.
judges: Wardlaw, Nguyen, Oliver